UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                           )
**DUDLEY SUMMERS,**                        )
                                           )
      **Plaintiff,**          )
                                           )
      **v.**                  )     **Civil Action No. 10-11792-DJC**
                                           )
**MICHAEL J. ASTRUE, Commissioner,**       )
**Social Security Administration,**        )
                                           )
      **Defendant.**          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                         November 10, 2011

## I.    Introduction

      Plaintiff Dudley Summers ("Summers") filed claims for disability insurance benefits ("SSDI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Summers brings this action for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on May 26, 2010 and reviewed and supplemented by the Decision Review Board ("DRB") on August 27, 2010, denying his claim.

      Before the Court are Summers' Motion to Vacate the decision of the Commissioner and the Commissioner's Motion to Affirm that decision. In his motion, Summers claims that the ALJ erred in denying his claim because: I) the ALJ's decision failed to apply the medical equivalence standard

1

of 20 C.F.R. § 404.1526 in determining whether Summers' impairments medically equal one of the "listed" impairments in the Social Security Regulations; and ii) the ALJ failed to consider the entire record, and, thus, his decision was not supported by substantial evidence. For the reasons discussed below, Summers' motion is DENIED, the Commissioner's motion is GRANTED and the final decision of the Commissioner is AFFIRMED.

## II.     Procedural Background

Summers claimed an inability to work since December 15, 2007 due to attention deficit disorder ("ADD"), depression and anxiety. R. 229; R. 292.[1] Summers filed a claim for SSDI with the Social Security Administration ("SSA") on April 29, 2008 and alleged an onset date of December 15, 2007. R. 100, 288.[2] His onset date was later changed from December 15, 2007 to February 29, 2008 due to earnings in 2008.[3] Pl.'s Mem. at 2; R. 94. After initial review, Summers' claim was denied on October 17, 2008. R. 122. His claim was reviewed by a Federal Reviewing Official and again denied on July 1, 2009. R. 131. On August 3, 2009, Summers filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 137. A hearing was held before an ALJ on April 20, 2010. R. 4. In a written decision dated May 26, 2010, the ALJ found that Summers did not have a disability within the definition of the Social Security Act and denied his claim. R. 116.

The DRB selected Summers' claim for review. R. 104. The DRB issued its decision on August 27, 2010, supplementing the ALJ's determination regarding the jobs that Summers can

---

[1]Citations to the administrative record in this case shall be to "R.____."

[2]Plaintiff also filed for SSI but did not pursue this application on appeal. R. 94.

[3]The ALJ noted that Summers' seeking to amend his onset date from December 2007 to February 2009, while also self-reporting employment activities in March and April of 2008, undercut Summers' credibility. R. 113.

perform at step five of the sequential evaluation process for determining disability, and adopting as its own the ALJ's decision as supplemented.  R. 1.  Accordingly, the ALJ's decision as supplemented by the DRB is the final decision of the Commissioner.

## III.  Discussion

### A.  Legal Standards

#### 1.  Entitlement to Disability Insurance Benefits

A claimant's entitlement to SSDI turns in part on whether he has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(I), 423(d)(1)(a); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920.  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  *Id.*  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  *Id.*  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  *Id.*  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  *Id.*  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied.  *Id.*  Fifth and

finally, if the applicant, given his or her RFC, education, work experience and age, is unable to do any other work, the application is granted. *Id.*

## 2. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (citing *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

## B. Before the ALJ

### 1. Medical History

In making his determination regarding Summers' application for SSDI benefits, the ALJ had before him medical evidence concerning Summers' learning disability; depression, anxiety, anger, and social functioning problems; and physical impairments.

#### a. Learning Disability

In September 2008, Summers underwent an examination with Dr. Andrew Morrison. R. 445-47. Summers told Dr. Morrison that he had ADD for most of his life, but that the medication Wellbutrin "makes all the difference in the world." R. 445. Although Dr. Morrison found that Summers "talked rather tangentially" and was "not very clear in his speech," he also noted that

Summers was "oriented times three" and "recalled three times after ten minutes, but was limited in digit span." R. 447. Dr. Morrison diagnosed Summers with ADD "by history." R. 447.

In October 2008, Dr. Michael Maliszewski, a non-examining state agency psychologist, reviewed the record and determined that Summers did not possess a mental retardation impairment. R. 452. However, Dr. Maliszewski noted that Summers had moderate difficulties in maintaining concentration, persistence and pace; moderate difficulties in maintaining social functioning; and mild restrictions in activities of daily living. R. 458. Dr. Maliszewski also performed a mental residual functional capacity assessment based on evidence in Summers' file and although he determined that he was moderately limited in some categories, he did not determine Summers to be markedly limited in any of the areas assessed. R. 462-64. Dr. Maliszewski reported that Summers had the recall capacity and attention span to perform simple tasks and would be capable of performing concrete tasks in a structured work setting. R. 464. Dr. Maliszewski also noted that Summers would perform best in a "more independent job role." R. 464.

In May 2009, Dr. Richard Stellar examined Summers. R. 576-84. He administered an I.Q. test and found that Summers had a verbal I.Q. score of 74, performance I.Q. score of 76 and full scale I.Q. score of 73. R. 581. Dr. Stellar determined that these scores indicated that Summers' intellectual abilities were "within the borderline range of intelligence." R. 581. The tests also revealed that Summers' abstract thinking skills were "quite impaired," his arithmetic abilities were at the fifth grade level and his reading and spelling skills were at the third grade level. R. 581-83. Dr. Stellar diagnosed Summers with borderline intellectual functioning.[4] R. 583.

_____

[4]"Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range, while mental retardation is a score of about 70 or below." *Hutsell v. Massanari*, 259 F.3d 707, 709 n.3 (8th Cir. 2001) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 39-40, 684 (4th ed.1994)).

Summers underwent a mental status assessment at the Edinburg Center in August 2009. R. 617. Carol Slade, LICSW, at the Edinburg Center, found Summers possessed average intelligence, was oriented in regard to time, place and person and had no impairments in level of consciousness, attention span, abstract thinking or calculation ability. R. 622. Charlene Budrius, Registered Nurse Psychiatric Clinician ("RNPC") at the Edinburg Center, assessed Summers had average intelligence but a poor "fund of info" during an assessment conducted on September 15, 2009. R. 627.

In October 2009, Slade completed a mental residual functional capacity assessment of Summers. R. 631-33. The assessment indicated that Summers was not significantly limited in his ability to carry out very short and simple instructions; was moderately limited in his ability to maintain attention and concentration for extended periods of time; and was moderately limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. R. 631. Slade also indicated Summers was moderately limited in his ability to work in coordination with or in proximity to others without being distracted. R. 631.

Summers' mother, Kate Bramer, wrote a letter dated March 31, 2010 to the ALJ, stating that Summers began exhibiting learning difficulties early on in his childhood and that he was placed in special education classes beginning in elementary school. R. 656. She further indicated that he did not attend special education classes in high school because his school, Waltham Vocational High School, did not have special education classes. R. 656. Nevertheless, Summers completed the eleventh grade. R. 577. Summers' friend, Barbara Paul, wrote a letter dated March 25, 2010 to the ALJ, indicating that she has noticed Summers has "a very limited attention span" as well as "difficulty concentrating on and understanding things because of his ADHD and other limits." R. 655.

### b. Depression, Anxiety, Anger and Social Functioning Problems

Dr. Morrison diagnosed Summers with a moderate degree of anxiety and anger. R. 447. He also noted that Summers had very limited social contact and he made a Global Assessment of Functioning ("GAF") of 45.[5] R. 447.

In Dr. Stellar's May 2009 evaluation, he noted that Summers "experiences vegetative signs of depression." R. 580. He diagnosed him with dysthmic disorder and adjustment disorder with anxiety and assigned a GAF score of 50. R. 583-84.

Slade conducted a mental status examination on Summers in August 2009 and found he demonstrated no abnormalities in his appearance, speech or perception, despite being somewhat evasive and reporting anger, anxiety and depression. R. 621-22. Slade also noted in her assessment that Summers had no abnormal thought content and no abnormal thought processes. R. 623. Budrius, who conducted a psychiatric evaluation on Summers in September 2009, found him to be cooperative, but reluctant to discuss his history at times. R. 626. She also found him to be slightly restless and irritable with angry, frustrated affects, and diagnosed him with dysthymia, ADHD and dyslexia. R. 626-27.

Bramer's letter to the ALJ stated that she had witnessed Summers stay in his room for three days at a time when he was depressed. R. 656. She also indicated that one of Summers' teachers "around the fifth grade" told her that Summers had suppressed anger and anxiety and recommended

---

[5]"The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social and occupational functioning and refers to the level of functioning at the time of evaluation." *Vazquez v. Astrue*, C.A. No. 10–cv–30136–MAP, 2011 WL 1564337, at *1 n.1 (D. Mass. Apr. 25, 2011) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–33 (4th ed., text rev. 2000) (hereinafter "DSM-IV")). A GAF of 41 to 50 reflects "serious symptoms or any serious impairment in social, occupational, or school functioning." *Kiklis v. Astrue*, C.A. No. 10–10699–NMG, 2011 WL 4768491, at *4, n.2 (D. Mass. Sept. 28, 2011) (citing DSM-IV 34).

that he visit a psychiatrist, which the record indicates he did on one occasion prior to filing an application for SSDI.  R. 494-97, 656.

<b>c.        Physical Impairments</b>

Summers reported that he was involved in a motor vehicle accident in January 2008.  R. 647. Dr. Andrew Nichols, Summers' primary care physician, examined Summers a few days after the accident and found he had lower back pain, but normal sensation, strength and reflexes, and no spinal or costovertebral angle tenderness.  R. 647.  In March 2008, Summers reported he was involved in a second car accident.  R. 358.  On the same day as Summers' second car accident, he went to Newton-Wellesly Emergency Room, where he told Dr. Mark Lemons he had a gradual onset of pain as well as stiffness in his upper neck and lower back.  R. 358.  However, the medical records at Newton-Wellesley Emergency Room indicate that Dr. Lemons diagnosed Summers with only neck and back strain.  R. 359.

Summers underwent an initial comprehensive examination at the Back and Neck Treatment Center on March 27, 2008.  R. 503.  During subsequent visits, he exhibited moderate fixation of the spinal joints, moderate muscle tightness in the back and an intense degree of pain.  R. 503-08. During his May 13, 2008 evaluation at the Back and Neck Treatment Center, Summers indicated that the pain in his cervical region was lessening and the evaluation conducted by Dr. Sherman also indicated a reduction in pain intensity.  R. 507-08.

In March 2008, an MRI of Summers' spine reflected normal alignment, no fracture, no focal soft tissue swelling and no bony lesions, but did reveal C4 - C7 prominent uncinate osteophytes, with possible right C6 - C7 neural foraminal narrowing.  R. 438.  An MRI was performed on Summers again in February 2010, which showed "mild broad-based disc bulge at L5 - S1 with an

8

annular tear causing bilateral neural foramina and contacting the exiting S1 nerve roots bilaterally." R. 635-36.

Dr. Morrison performed an examination in September 2008 and diagnosed Summers with low back pain of unknown origin. R. 447.

In February 2009, Dr. Nichols examined Summers again. R. 552. A radiology report prepared by Dr. Nichols indicates that Summers had no fracture or dislocation of the lumbar spine, that his lumbar vertebral bodies had normal height and alignment and that his intevertebral disk spaces were preserved and his sacral arches were normal. R. 552. Dr. Nichols also found Summers had normal curvature of the spine, no vertebral spine tenderness, no paraspinal tenderness, no sciatic notch tenderness, normal lower extremities except a slightly decreased hip flexion and a normal sensory exam, as well as symmetrical reflexes. R. 643. Dr. Nichols stated in his report that "[o]ver many years, I have only seen [Summers] . . . regarding his back issues on a few occasions, each time when he required paperwork filled out for disability purposes," and reported that he does not regularly take pain medication or regularly follow up for further testing. R. 572. Dr. Nichols also noted that "the talus nature of his hands suggest[s] he may be doing heavier labor [than] he admits" to be doing. R. 573.

## 2. ALJ Hearing

At the April 20, 2010 administrative hearing, the ALJ heard testimony from Summers, non-treating medical expert ("ME") Dr. Alfred G. Jonas and vocational expert ("VE") Ruth Baruch.[9]

---

[9]In the transcript of the hearing before the ALJ, Ruth Baruch is referred to as Ruth Baruke. R. 5, 75, 82.

### a.      Summers' Testimony

Summers testified that his ADD and dyslexia create communication problems. R. 39. He testified that he cannot concentrate when he tries to read or solve math problems. R. 44. Summers also testified that when he becomes depressed, he usually spends his days sleeping, has decreased energy and interest in activities and does not want to look in the mirror. R. 51. He stated that he takes the medication Wellbutrin which helps to control his rage. R. 52.

Summers testified that from 2005 through 2008, he worked for various construction and contracting companies and was self-employed as a painter, roofer and carpenter. R. 13-20. Summers testified that he was involved in a car accident in 2008 and when he returned to work after a few weeks away "an arrogant person [was] doing [his] . . . job," he could not walk as fast anymore and was laid off. R. 22-23. He testified that he did no work, not even small jobs, in 2009. R. 23. In response to being presented with evidence from Dr. Nichols that his skin was calloused and his hands were dirty in November 2009, consistent with heavy labor, Summers testified that he did "stuff around the house." R. 23. He also stated: "I have a dirty pile of tools that I mess with, and I'm not out working, but I worked quite a while in the trades with my hands. My hands are still calloused." R. 23. When questioned further about work he does around the house, he stated: "I sweep up a bit, I move a few things, but I don't work . . . I try to move as much as I can without over exerting myself, and hurting my neck." R. 24.

### b.      Dr. Jonas' Testimony

Dr. Jonas is a psychiatrist who testified as the ME. R. 53. He testified about his perception of Summers' medical problems based on the medical evidence in the record and Summers' hearing testimony. R. 54, 60. In regard to the allegations of chronic back pain, Dr. Jonas testified that the

MRI demonstrated "minor, but distinct" findings in the lumbar spine and that the findings were "less significant" for the cervical spine. R. 61. Dr. Jonas also opined that Summers' limitations with regard to activities of daily living were none to mild. R. 65. With respect to concentration, persistence and pace, Dr. Jonas stated that the impairments were probably mild and possibly moderate. R. 65-66.

Dr. Jonas testified that Summers' limitations in maintaining social functioning were moderate to marked. R. 65. He stated that Summers' social impairments indicate he should not "deal with the broad general public . . . [or] with collections . . . [of] coworkers or supervisors" if the interaction is a primary part of the work. R. 68. Dr. Jonas also testified that there was no indication that Summers is unable to work in proximity to people or even to have occasional interactions as long as the proximity and interactions are not the primary aspect of the work. R. 68. Furthermore, Dr. Jonas indicated that Summers' ability to work for a number of years suggests that he has a high level of adaptive functioning. R. 69. Dr. Jonas explained that Summers does not fall within listing 12.05 in 20 C.F.R. Part 404, Subpart P, Appendix 1, even taking into account his back and neck pain, as well as his levels of arithmetic, reading and spelling abilities. R. 70-71. Finally, Dr. Jonas stated that his assessment did not account for Summers' GAF scores, as reported by Dr. Morrison and Dr. Stellar, because he believes that "GAF is generally poorly understood, and poorly applied." R. 72, 447, 584.

### c.    VE Baruch's Testimony

The VE testified about Summers' physical and mental functioning based on two hypothetical questions that were presented. R. 75-90. In response to the first hypothetical, which described a person with less restrictive limitations than those the ALJ determined Summers had, the VE stated that this hypothetical person would not be able to perform any past relevant work, but would be able

to work as a table worker, a surveillance systems operator and a bench assembler, all of which exist in substantial numbers in the regional and national economies. R. 79. In response to the second hypothetical, which presented a person with restrictions similar to those the ALJ determined Summers had, the VE opined that the person would be able to do jobs such as bench assembler and hand packager inspector and that the person would also be able to perform "some mail sorter work." R. 81-82.

### C.    Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 15, 2007, the original date Summers' claims he became disabled. R. 109. At step two, the ALJ found that Summers' learning disability, personality disorder and degenerative disc disease of the cervical and lumbar spine were severe. R. 110. Summers does not dispute the findings at either step one or step two.

At step three, the ALJ found that none of Summers' impairments, either separately or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 111-12. Summers disputes the ALJ's determination at this step.

Before reaching his step four determination, the ALJ evaluated Summers' residual functional capacity, finding that Summers could perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that he can stand and/or walk for at least 2 hours in an 8 hour workday, sit for 6 hours in an 8 hour workday, with the need to alternate periodically between sitting and standing. R. 113. The ALJ also found that Summers could only occasionally climb, balance, stoop, kneel, crouch and crawl, and that he should avoid concentrated exposure to extreme cold and vibrations and avoid even moderate exposure to hazardous tasks, moving, dangerous machinery and heights. *Id.* The ALJ noted that Summers would be able to understand and carry out instructions for simple

tasks being defined as four to five step tasks; would be able to maintain concentration, persistence and pace in the performance of these simple tasks for two-hour increments over an eight-hour workday for a forty-hour work week; and would be able to have casual and superficial interactions with co-workers and supervisors, but would not be able to perform work with the broad general public or where the primary task would be focused on interactions with co-workers. *Id.* Accordingly, the ALJ concluded that Summers had the RFC to perform light work. *Id.* At step four, the ALJ determined that Summers is precluded from performing any past relevant work. R. 114. Although Summers does not dispute the ALJ's RFC assessment at step three or step four, he does dispute the RFC assessment at step five of the analysis. Pl.'s Mem. at 18.

At step five, the ALJ found that considering Summers' age, education, work experience and RFC, as well as the vocational expert's testimony, Summers is able to perform other work that exists in significant numbers in the national economy. R. 115-16. As a result, the ALJ did not find Summers disabled from December 15, 2007 through the date of his decision, May 26, 2010. R. 116. Summers disputes this finding. Pl.'s Mem. at 16-18.

### D.    Summers' Challenges to the ALJ's Findings

Summers contends that the ALJ erred by: (1) failing to apply the medical equivalence standard of 20 C.F.R. § 404.1526 in reviewing whether Summers' impairments meet or equal a listed impairment; and (2) failing to provide substantial evidence for his conclusions because he did not consider the totality of the record. Pl.'s Mem. at 9-18. Summers' first challenge relates to the ALJ's determination at step three; Summers argues that the ALJ failed to consider the effects of Summers' impaired mental functioning, together with his other physical and mental health conditions, and also failed to evaluate Summers' impairments under the Social Security Administration Program Operation Manual System ("POMS"). The second challenge relates to the

ALJ's RFC determination and findings at step five; Summers asserts that the ALJ neglected to consider mental assessments by Drs. Stellar and Morrison as well as portions of Dr. Jonas' medical testimony at the April 20, 2010 hearing, and thus, erred in determining that Summers could still perform jobs that exist in significant numbers in the national economy.

### 1. Medical Equivalence Standard of 20 C.F.R. § 404.1526

At step three, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Summers does not contend that he meets one of the listed impairments. Pl.'s Mem. at 11. Rather, he contends that his impairments equal listing 12.05(c) of 20 C.F.R. Part 404, Subpart P, Appendix 1. Pl.'s Mem. at 11-12. To meet listing 12.05(c), a claimant must establish that he developed deficits in adaptive functioning prior to age 22, and that he has a valid I.Q. score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(c); *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 13-14 (1st Cir. 1985). To equal a listing, the claimants' medical findings must be "at least equal in severity and duration to the listed findings." 20 C.F.R. § 416.926(a). Summers correctly argues that when determining whether claimant's impairments are equivalent to a listed impairment, all evidence in the claimant's case record about his various impairments and their combined effects on the claimant must be considered. Pl.'s Mem. at 10; 20 C.F.R. § 404.1526(c).

Here, the ALJ's finding that Summers' impairments, considered separately and in combination, did not meet or medically equal the criteria of the listings is supported by substantial evidence. Although Summers argues that the ALJ focused on whether or not Summers "meets" the criteria of listing 12.05, and went through each component of listing 12.05 and explained why each

14

criterion is not met by Summers' impairments, Pl.'s Mem. at 11, the ALJ also stated explicitly in his decision that he considered whether the impairments separately or in combination met or medically equaled the criteria of the listings. R. 111-12. Although the ALJ does not provide a lengthy explanation of why the combination of impairments failed to equal the 12.05 listing, stating that he considered the combination of impairments was sufficient. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (finding that to require a more elaborate articulation of the ALJ's thought process would be unreasonable when the ALJ decision specifically referred to "a combination of impairments" and said his decision was made "[a]fter careful consideration of the *entire record"*) (emphasis in original).

Summers argues that a certain POMS provision provides guidance on evaluating whether his condition meets or medically equals a listing. Pl.'s Mem. at 10-11. The POMS provision states that "slightly higher IQ's (e.g. 70-75)" may still leave room for a Plaintiff to equal the listing if there are other physical or mental disorders that impose additional and significant work-related limitations. U.S. SOC. SEC. ADMIN., POMS § DI 24515.056(D)(1)(c), 2001 WL 1933392 (Apr. 1, 2010). Although the First Circuit has considered the POMS provision in the context of a challenge to a social security ruling, Pl.'s Reply Mem. at 3; *see also Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 24 (1st Cir. 1986) (noting that the Court "construe[s] POMS DI T00401.570 as being the latest word on departmental pain policy, committing the Secretary and superceding any inconsistent discussion and examples" and noting that it would not "countenance any decision of the Secretary contrary to the liberalized modification of SSR 82-85 as contained in the POMS instructions"), the POMS "has no legal force, and it does not bind" the Commissioner. *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981). POMS is "only internal SSA guidance . . . and may not be

relied upon to create any rights enforceable at law by any party in a civil . . . action."[10] Accordingly,

the Commissioner is not required to refer to the POMS when determining whether an impairment

or combination of impairments meets or medically equals listing 12.05.[11]

### 2. ALJ's Conclusions Supported by Substantial Evidence

Despite Summers' contentions otherwise, the ALJ's finding that Summers' mental and

physical impairments do not equal listing 12.05(c) is supported by substantial evidence. First, the

ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity

to the criteria of any listed impairment." R. 111. The ALJ's decision does address Summers' I.Q.

scores, as well as the assessment made by UMASS Disability Evaluation Services, which was a

report that incorporated Dr. Stellar's findings. R. 112, 114, 581-82, 596-98.

To the extent the medical evaluations are inconsistent, the Commissioner and his designee,

the ALJ, have the responsibility for weighing conflicting evidence. *Seavey v. Barnhart*, 276 F.3d

---

[10]U.S. SOC. SEC. ADMIN., POMS, https://secure.ssa.gov/poms.nsf/home!readform (last visited Nov. 2, 2011).

[11]This Court notes the Commissioner's argument that Summers did not meet his burden of showing that he had a deficit in adaptive functioning that developed prior to age 22. Def.'s Mem. at 10; 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05. Nevertheless, the ALJ did not make a determination regarding Summers' adaptive functioning prior to age 22 and Summers did not argue that the ALJ erred in this respect. Even if Summers did contend that the ALJ failed to evaluate whether he had failures of adaptive functioning prior to age 22, this argument would not warrant remand because the ALJ found no issues with adaptive functioning *now*. Although a claimant must show that the impairment existed prior to age 22 to meet or equal listing 12.05, that specific showing is not alone sufficient and the claimant must also show the deficit is currently present. *See Cogdell v. Astrue*, 2010 WL 6243317, 6 (D.S.C. 2010) (finding that despite "whatever failure might have existed in the [ALJ's] examination of early evidence of deficits in the plaintiff's adaptive functioning, it does not affect the ALJ's analysis of evidence that such deficits do not exist now"). Since this Court finds that there was substantial evidence to support the ALJ's determination that Summers does not presently have "deficits in adaptive functioning," any failure to consider Summers adaptive functioning prior to age 22 would not change the outcome of this case. Id.; R. 112.

1, 9 (1st Cir.2001) (citation omitted); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987) (the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"); *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981) (" '[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' " (citation omitted)).   Substantial evidence supporting the Commissioner's decision exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez*, 647 F.2d at 222 (citations omitted).   This is true "even if the record arguably could justify a different conclusion." *Rodriguez Pagan*, 819 F.2d at 3 (citing *Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981)).

In this case, Dr. Stellar's observations are inconsistent with substantial evidence in the record which demonstrates ongoing functioning despite certain limitations.   As the ME observed, Summers was working during the time that he was assessed with allegedly low I.Q. scores, which contradicts a claim of disability or deficit in adaptive functioning prior to age 22.   R. 69.   *Cf. Bently v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) (noting that the fact that Plaintiff looked for work reasonably indicates that he "did not view his pain as disabling").   Moreover, Dr. Jonas reviewed the entire record and determined that Summers' impairments did not equal listing 12.05(c).   R. 68-69.   Although Dr. Jonas stated that "[w]e don't have an opportunity from this record to get to 12.05," his response was in regard to whether Summers' impairments <u>equaled</u> listing 12.05(c).   The ALJ stated that he gave "great evidentiary weight" to Dr. Jonas' opinion because he is "an impartial psychiatrist who thoroughly reviewed the medical evidence of record and listened to the claimant's hearing testimony."   R. 114.   *See Keating v. Sec'y of Health and Human Servs.*, 848 F.2d 271, 275 n.1 (1st Cir. 1988) (citing *Lizotte*, 654 F.2d at 130 ("It is within the [Commissioner's] domain to give greater

weight to the testimony and reports of medical experts who are commissioned by the [Commissioner].").  The ALJ considered the totality of the record, and his determination that Summers had not demonstrated that he met or medically equaled listing 12.05 was supported by substantial evidence.[12]

### 3.    ALJ's Determination Regarding Summers' Ability to Adjust to Other Work

To determine whether a successful adjustment to other work is possible, the ALJ must consider the claimant's RFC, age, education and work experience in combination with the Medical Vocational Guidelines.  20 C.F.R. Part 404, Subpart P, Appendix 2.  Based on the record as a whole, the ALJ concluded that since December 15, 2007, Summers had a RFC for light work,[13] noting several limitations to the light work in which he could engage.  R. 113 (noting limitations to light work).  In determining Summers' RFC, the ALJ considered:  (1) all symptoms and the extent to which the symptoms are consistent with the objective medical evidence; (2) the opinion evidence, including statements of Summers' mother and friend; and (3) the functional capacity assessments

---

[12]The Commissioner accurately notes that Summers misstates the substantial evidence standard.  Def.'s Mem. at 13 n.10; Pl.'s Mem. at 18.  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  *Rodriguez*, 647 F.2d at 222.  Even if substantial evidence supported a conclusion at odds with the ALJ's decision, substantial evidence may still support the ALJ's determination. *See Nat'l Labor Relations Bd. v. Nevada Consol. Copper Corp.*, 316 U.S. 105, 106 (1942) (noting that the "possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them").

[13]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

of the claimant's treating physician Dr. Andrew Nichols and the mental health professionals at the Edinburg Center; and (4) Summers' statements concerning the intensity, persistence and limiting effects of his symptoms. R. 113-14. The ALJ gave controlling weight to claimant's treating physician, Dr. Nichols, because he is the "treating source" within the meaning of Sections 404.1502 and 416.902 of Regulations Nos. 4 and 16. R. 114. The ALJ also gave great weight to the opinion of Dr. Jonas, since he is an impartial psychiatrist who reviewed the medical evidence of record and listened to the claimant's hearing testimony. R. 114. Since the ALJ determined that Summers had the RFC to engage in "light work," but with limitations, he also considered the vocational experts testimony regarding whether jobs exist in the national economy for an individual with Summers' age, education, work experience and RFC. R. 115.

Summers argues that the ALJ failed to consider all symptoms, including mental and physical impairments, in determining his RFC. Pl.'s Mem. at 18. Specifically, Summers argues that the ALJ failed to consider Dr. Stellar's report of "vegetative signs of depression," borderline range of intellectual functioning, learning disabilities and adjustment disorder with anxiety. Pl.'s Mem. at 18; R. 577-84. Summers also argues that the ALJ's characterization of Summers' impairments is unsupported by Dr. Stellar's report and by the testimony of Dr. Jonas at the April 20, 2010 hearing. Pl.'s Mem. at 16. Moreover, Summers contends that the ALJ's finding that he could perform jobs which exist in significant numbers in the national economy is inconsistent with Dr. Morrison's observations. Pl's Mem. at 16; R. 445-47. Summers further claims that the ALJ's decision failed to consider the weight of Summers' GAF scores. R. 16-17.

Summers' arguments fail for three primary reasons. First, Dr. Stellar was not a treating physician, and thus, his opinion was not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Even if he was a treating physician, the ALJ was not bound to give controlling weight to his opinion

because it is inconsistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2) (opinions of treating physicians given controlling weight only if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record"). Moreover, although Summers highlights Dr. Stellar's report of borderline range of intellectual functioning, the ALJ recognized this concern by finding that Summers had a learning disability at step two and considering Summers' I.Q. scores at step three of the five-step analysis. R. 110, 112.

Second, there is substantial evidence in the record supporting the ALJ's decision that Summers had the RFC to engage in "light work." R. 113. Dr. Morrison noted that Summers was "oriented times three" and "recalled three times after ten minutes." R. 447. Furthermore, Dr. Maliszewski found that Summers did not possess a mental retardation impairment. R. 448-61. Slade, LICSW, reported that Summers was "oriented"; had no impairments in his level of consciousness, attention span or calculation ability; and was not limited in his ability to carry out very short and simple instructions. R. 622, 631; 627 (RNPC Budrius assessing Summers to be of average intelligence). Slade found Summers demonstrated no abnormalities in his appearance, speech or perception; had no abnormal thought content or thought processes; and found no symptoms of depression, irritability, appetite/sleep disturbance or anxiety/panic attacks. R. 621-23. The medical records at Newton-Wellesly Emergency Room indicate Summers had a normal physical examination after the second motor vehicle accident, with only neck and back strain diagnosed. R. 359. Moreover, the MRI in March 2008 of Summers' cervical spine reflected normal alignment, no fracture, no soft tissue swelling and no body lesions. R. 438.

In addition, the ALJ noted that Summers residual functional capacity is based on functional capacity assessments of Summers' treating physician Dr. Andrew Nichols and the mental health

professionals at the Edinburg Center. R. 114, 572-73, 616-32. The ALJ gave controlling evidentiary weight to the opinion of Dr. Nichols because he is a " 'treating source' within the meaning of Sections 404.1502 and 416.902 of Regulations No[s]. 4 and 16" and since his "assessment is well supported and not inconsistent with other substantial evidence in this case." R. 114 (citing Social Security Ruling 96-7P). Dr. Nichols reported that Summers had normal sensation, strength and reflexes, and no spinal or costovertebral angle tenderness a few days after his first motor vehicle accident. R. 647. Dr. Nichols also indicates that "over many years, [he has] only seen the patient regarding his back issues on a few occasions, each time when he required paperwork filled out for disability purposes." R. 572. Dr. Nichols also noted that Summers "does not take any regular pain medications and has not followed up regularly regarding further testing [or] workup." R. 572. Dr. Nichols reported that the latest lab work he performed on Summers "did not reveal any evidence of an underlying inflammatory condition." R. 572. Dr. Nichols further noted that "the talus nature of [Summers] hands suggested he may be doing heavier labor [than] he admits to be able to do be doing." R. 573.

Additionally, the ALJ indicated that he gave "great evidentiary weight" to the opinion of Dr. Jonas because he is "an impartial psychiatrist who thoroughly reviewed the medical evidence of record and listened to the claimant's hearing testimony." R. 114. Dr. Jonas explained that Summers does not fall within listing 12.05 in 20 C.F.R. Part 404, Subpart P, Appendix 1, even taking into account his back and neck pain, as well as his levels of arithmetic, reading and spelling abilities. R. 70-71. Although Dr. Jonas testified that Summers' limitations in maintaining social functioning were moderate to marked and his restrictions with regard to concentration, persistence and pace were mild to moderate, he also noted that Summers could work in proximity to people as long as the

interactions are not the primary aspect of the work. R. 60-68. Dr. Jonas also testified that Summers

ability to work for a number of years suggests he has a high level of adaptive functioning. R. 69.

Furthermore, the vocational expert testified that given all the factors presented, an individual

with impairments such as Summers would be able to perform the requirements of jobs like bench

assembler and hand packager and would also be able to perform "some mail sorter work." R. 81-82.

The vocational expert testified that these jobs exist in significant numbers in the regional and

national economies. R. 82. Additionally, Summers' activities of daily living support the ALJ's

determination. Summers had the ability to pay bills, count change, handle a savings account and

use a checkbook. R. 314. Accordingly, there is substantial evidence in the record which supports

the ALJ's decision that Summers has the RFC to engage in "light work."

Third, an ALJ's failure to mention expert opinions in various ways does not warrant reversal

where there was substantial evidence to support the ALJ's final conclusion. *See e.g., Goncalves v.*

*Astrue*, 780 F. Supp. 2d 144, 148-49 (D. Mass. 2011) (holding ALJ's findings supported by

substantial evidence despite ALJ's failure to specifically discuss assessment by a vocational

rehabilitation counselor). Here, there is substantial evidence for the ALJ's final conclusion, as

discussed above, and there is no question that the ALJ did not overlook evidence that would support

Summers' claim. Although Summers argues that the ALJ's decision did not take into account the

GAF scores reported by Drs. Stellar and Morrison, Pl.'s Mem. at 17, "GAF scores are not dispositive

when deciding whether a disability exists." *Eaton v. Astrue*, 2009 WL 2015903, at *7 (D.N.H. July

7, 2009) (citing *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)). "GAF scores

offer a snapshot of one's state at the time of the evaluation, but for an impairment to functionally

equal a listing it must also meet the duration requirement, about which the GAF score says nothing."

*Id.* (citing 20 C.F.R. § 416.909 ("Unless your impairment is expected to result in death, it must have

lasted or must be expected to last for a continuous period of at least 12 months.")). Furthermore, Dr. Jonas specifically testified that his assessment did not account for Summers' GAF scores because he believes that "GAF is generally poorly understood, and poorly applied." R. 72, 447, 584.

To support his argument that the ALJ's decision did not assess the totality of the record and was not supported by substantial evidence, Summers relies upon *Agresti v. Sec'y of Health & Humn Servs.*, 631 F. Supp. 1245 (D. Mass. 1986). Pl.'s Reply Mem. at 5-6. In that case, the Court reversed the denial of applicant's request for disability benefits because the ALJ acted improperly in relying solely on the report of one non-examining medical advisor and failing to analyze adequately substantial evidence which contradicted his findings. Id. at 1254. In contrast to *Agresti*, here, the ALJ's decision was supported by substantial evidence. The ALJ did not base his decision solely on the report of one medical examiner, but instead, he considered Summers' symptoms; opinion evidence from several medical experts; letters written by Summers' mother and friend; the functional capacity assessments of the claimant's treating physician and the mental health professionals at the Edinburg Center; and Summers' statements concerning the intensity, persistence and limiting effects of his symptoms. R. 114. Since the ALJ based his determination on significantly more than the report of one non-examining medical adviser, *Agresti* does not support a finding inconsistent with the ALJ's decision.

## IV.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Summers'

motion to vacate is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge